Marc P. Berger
Lara Shalov Mehraban
Sandeep Satwalekar
Jorge G. Tenreiro
Christopher Dunnigan
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | COMPLAINT |
| v. | 19 Civ. _____ |
| DAVID WAGNER, MARK LAWRENCE, DOWNING PARTNERS, LLC, DOWNING INVESTMENT PARTNERS, LP, and DOWNING DIGITAL HEALTHCARE GROUP, LLC, | JURY TRIAL DEMANDED |
| Defendants. | |

---

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against Defendants David Wagner ("Wagner"), Mark Lawrence ("Lawrence"), Downing Partners, LLC ("Downing"), Downing Investment Partners, LP ("DIP"), and Downing Digital Healthcare Group, LLC ("DDHG") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. This action involves Defendants' multi-year scheme to defraud dozens of investors out of millions of dollars by peddling investment opportunities in the healthcare

services and technology industry. Defendants Wagner, Downing, DIP, and DDHG misappropriated investor funds by charging them undisclosed fees. Additionally, Defendants lied to investors about the cash reserves and revenues of the investment opportunities.

2. From approximately May 2014 through January 2017, Defendants raised over $8 million from over thirty investors, many of whom were also hired as purported employees of DIP, DDHG, Downing Health Technologies, Inc. ("DHT") and Cliniflow Technologies, LLC ("Cliniflow," and collectively, the "Funds").

3. Within a seven-month period from June 2014 through December 2014, Defendants Wagner, Downing, DIP, and DDHG defrauded investors in DDHG by misusing at least $540,000 of the $1.5 million invested in DDHG to pay unregistered investment advisers Wagner and Downing hidden management fees. The fraudulent management fees were paid pursuant to an undisclosed agreement that Wagner had previously and secretly negotiated as principal of Downing and DDHG. By virtue of this conduct, Wagner defrauded investors by prioritizing paying his salary and management fees over the purported investment objectives of the Funds. These payments were contrary to representations to investors in the DDHG Private Placement Memorandum, which specifically stated that no such compensation was due any member of management.

4. Also, contrary to Defendants' misrepresentations to investors, and as Defendants were aware, the Funds had significantly lower cash reserves and revenues than represented. In fact, the Funds struggled to meet even basic payroll obligations, despite Defendants having led investors to believe that the Funds had sufficient liquidity to provide stable employment.

5. In fact, the Funds were so desperate for cash that Wagner defrauded investors in the Funds by causing the Funds to use new investor dollars to pay amounts owed to existing

investors.

6. As a result of Defendants' fraudulent conduct the Funds have been drained of liquidity and have ceased operations, resulting in millions of dollars in losses to investors.

## **VIOLATIONS**

7. By engaging in the conduct set forth in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. In addition, Wagner, Downing, and DIP aided and abetted DDHG's violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

8. By engaging in the conduct set forth in this Complaint, Wagner and Downing violated Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. In addition, Wagner and Lawrence aided and abetted Downing's violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

9. Wagner is also liable under Section 20(a) of the Exchange Act, as a control person of Downing, DIP, and DDHG, for Downing's, DIP's, and DDHG's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

10. Unless Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## **NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

11. The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Sections 21(d)(1) & (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) & (d)(5)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)]. The Commission seeks a final judgment: (i) permanently enjoining the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein; (ii) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon, with Wagner and Downing liable on a joint and several basis; (iii) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and (iv) ordering such other and further relief the Court may find appropriate or necessary for the benefit of investors.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d) and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)]. Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. A substantial part of the events or omissions giving rise to the claims herein occurred in the Southern District of New York. Among other things, Defendants' false and misleading statements and fraudulent schemes were

made and directed to residents of this District, including making materially false misrepresentations and omissions to at least two residents of this District, and having, at various times relevant to this matter, places of business within the Southern District of New York.

## DEFENDANTS

14. **Wagner**, age 64, resides in East Greenwich, Rhode Island. Wagner is the Chief Executive Officer and Chairman of DP; Chairman of DIP; CEO, Chairman, and board member of DDHG and DHT; and Chairman of Cliniflow. At all relevant times, Wagner had signatory authority and control over the bank accounts of DP, DIP, DDHG, DHT, and Cliniflow. Wagner owns or controls, directly or indirectly, 100% of DP and at least 90% of DIP and 80% of Cliniflow (by virtue of his and his family's ownership of Cliniflow's largest partner).

15. **Lawrence**, age 64, resides in WaterColor, Florida. Lawrence is the President of DDHG and Cliniflow, the President and COO of DHT, and solicited investments on behalf of the Funds.

16. **Downing** is an investment advisory firm organized as a Delaware corporation with offices in West Warwick, Rhode Island and Boston, Massachusetts. Downing is a minority shareholder of DDHG and DHT and the managing partner or member of DIP and DHT and, along with DIP, provided investment management services to DDHG in exchange for a fee.

17. **DIP** is a private fund incorporated in Delaware, with offices in Boston, Massachusetts and New York, New York. Managed by Wagner and Downing, DIP's purported investment objective was to acquire, manage, and sell healthcare companies. Defendants raised over $5 million in equity interests in DIP from investors from approximately May 2014 through January 2017 (the "Relevant Period"). Despite being a private fund, DIP was also the majority shareholder of DDHG and DHT, and, along with Downing, provided investment and fund

management services to DDHG.

18. **DDHG** is a private fund incorporated in Delaware, with offices in Boston, Massachusetts, and which had an undisclosed management services agreement with Downing. Defendants raised approximately $1.5 million in equity interests in DDHG from approximately June 2014 through February 2015.

## RELEVANT ENTITIES

19. **DHT** is a private fund incorporated in Delaware, with offices in Boston, Massachusetts, and which had Downing as its fund adviser. Defendants raised at least $1.6 million in equity interests in DHT from approximately February 2015 through at least May 2016.

20. **Cliniflow** is a private fund incorporated in Delaware, with offices in New York, New York. Defendants raised at least $1.6 million in equity interests in Cliniflow from approximately May 2016 through at least January 2017.

## FACTS

**A.  Background**

### 1. Wagner Controlled Downing and the Funds

21. Wagner perpetrated the fraudulent scheme through Downing and the Funds, a series of interconnected entities of which he was the majority owner and/or which he controlled directly or indirectly. Wagner was the sole owner of, and controlled, Downing. Wagner also controlled the Funds indirectly through their managers, Downing and DIP, by virtue of his ownership of and position as CEO and Chairman of Downing, his family's and/or Downing's majority ownership of DIP, and his position as Chairman of DIP.

22. During the Relevant Period, Wagner had signatory authority and control over the bank accounts of Downing and the Funds, and Wagner had principal authority over the

investment decisions of the Funds.

### 2. Defendants Lured Victims to Invest in the Funds

23. According to Defendants and to the Funds' various offering materials, the Funds' various investment portfolios consisted of companies that purportedly provided healthcare services and developed healthcare technologies (the "Portfolio Companies"). These Portfolio Companies were allegedly acquired and managed by the Funds for resale at a profit to the Funds and its investors.

24. To effect their fraudulent investment scheme, Defendants first used headhunters to identify potential executives interested in working in the biomedical field and in employment opportunities in either the Funds or their Portfolio Companies. The headhunter then typically referred the potential investors to Defendant Lawrence, who then informed the potential investors that the employment opportunity required them to invest cash in one of the Funds and become an equity shareholder of that Fund.

25. Wagner and Lawrence told potential investors that investments in the Funds – which ranged from $50,000 to $500,000 – entitled investors to (1) a *pro rata* share of any profits from the Funds' management or sale of the Portfolio Companies; and (2) full-time employment – as a purported work-from-home sales person for the products of the Portfolio Companies, or in other positions – at an annual salary between $150,000 to $250,000.

26. During the Relevant Period, Lawrence typically explained the investment opportunity to prospective investors, including answering questions about the Funds' and the Portfolio Companies' financial conditions. Lawrence also answered prospective investors' due diligence questions by email, over the phone, and in person, and, on occasion, met with potential investors to solicit investments and explain the purported employment opportunity.

27. On occasion, Wagner also met in person with prospective investors and/or answered questions about the investment and the employment opportunity.

28. Wagner, Downing, DIP, and Lawrence solicited investments in DIP from approximately May 2014 through January 2017; in DDHG from approximately June 2014 through February 2015; in DHT from approximately February 2015 through May 2016; and in Cliniflow from approximately May 2016 through January 2017.

29. Wagner pooled the investment proceeds for the alleged purpose of acquiring equity interests in the Portfolio Companies.

30. Downing and Wagner received fees from the Funds for selecting and managing the Funds' investments in the securities of the Portfolio Companies.

31. Wagner and Downing had discretion to make investment decisions for the Funds—in particular, they selected the Portfolio Companies in which the Funds invested.

32. There was little, if any, work for Defendants' victims to perform on behalf of the Funds other than being asked to attempt to recruit additional investors—the prospect of employment was, for most investors, a fiction meant to lure them into investing.

**B.  Wagner, Downing, DIP, and DDHG Misappropriated Investor Proceeds in the Guise of Undisclosed "Management Fees"**

33. By virtue of Wagner's control of DDHG, DIP, and DDHG, he, along with Downing, DIP, and DDHG, had authority to determine, and did determine, the contents of the DDHG Private Placement Memorandum (the "DDHG PPM"), as well as its manner of distributions to potential and actual investors.

34. Wagner, Downing, DIP, and DDHG knowingly or recklessly made false and misleading statements and material omissions in the DDHG PPM concerning DDHG's use of investor proceeds and, in particular, its use of proceeds to pay management fees.

35. The DDHG PPM, originally dated as of May 1, 2014, stated that "[t]here is no accrued compensation that is due any member of Management," and that "[c]urrently, there are no Management salaries paid other than to" Lawrence as President of DDHG or to his successor as President.

36. Similarly, the "Use of Proceeds" section of the DDHG PPM further misled investors into thinking that no management fees were due or being paid, by omitting mention of management fees and setting forth the allocation of investor proceeds for other purposes, as the following table from the DDHG PPM's "Use of Proceeds" section shows:

| Category | Maximum Proceeds | Percentage of Total Proceeds | Minimum Proceeds | Percentage of Proceeds |
|---|---|---|---|---|
| Portfolio Company Investments | $4,00[0],000 | 89.0% | $200,000 | 80% |
| R&D of Properties | $20,000 | 0.5% | $5,000 | 2% |
| Marketing | $230,000 | 5% | $5,000 | 8% |
| Corporate Expenses | $230,000 | 5.5% | $20,000 | 8% |
| Total Corporate Use | $4,580,000 | 99.5% | $245,000 | 98% |

37. As Wagner knew or recklessly disregarded, the DDHG PPM statements reflected in paragraphs 35 and 36 were materially false and misleading, and omitted material information necessary to make the facts stated therein not misleading.

38. In reality, Wagner had executed a management agreement (the "Management Agreement") between Downing and DDHG on March 30, 2014, which required DDHG to pay a monthly management of $80,000 to Downing starting on June 1, 2014.

39. Wagner also failed to revise or update the DDHG PPM after the DDHG Management Agreement's stated effective date (June 1, 2014), or to otherwise inform investors and prospective investors in DDHG that the DDHG Management Agreement – and its significant

9

fee obligations on the Fund – had become effective.

40. Moreover, Wagner also knew or recklessly disregarded that given the large amount of "management fees" due to Downing pursuant to the DDHG Management Agreement, DDHG would not (and did not) spend between 80% and 89% of its proceeds to invest into the Portfolio Companies, as stated in the DDHG PPM.

41. Rather than disclose the truth to investors or update the Funds' investors as to these material developments, Wagner actively sought to conceal the undisclosed management fees from DDHG investors after they had invested.

42. For example, in a December 23, 2014 email, Wagner instructed a DIP employee that, if the employee calculated that prospective investors would "not respond favorably" to seeing DDHG's financial statements, then the employee should not "share the financials."

43. From June to December 2014, Wagner, Downing, DIP, and DDHG fraudulently raised approximately $1.5 million from DDHG investors. During that time, Wagner transferred or authorized the transfer of over 35% of the $1.5 million raised (at least $540,000) to Downing as undisclosed management fees. Wagner characterized these payments as management fees, reflecting over $549,000 as "management services fees" payable from DDHG to Downing in DDHG's general ledger for 2014.

C. **Defendants Made Misrepresentations to Investors Regarding the Funds' Financial Health and Viability**

44. Defendants also knowingly or recklessly made misrepresentations to prospective investors about the then-current financial condition of the Funds, thereby misleading investors into thinking the investments were safer and more likely to generate positive returns than they were.

### 1. Misrepresentations about Cash Reserves and Revenues

45. At various times, Wagner and Lawrence misrepresented the cash on hand, cash reserves, or cash "available" of the various Funds as between $1 million and $20 million when, in truth, the Funds had only a few hundred thousand dollars in their respective bank accounts. Lawrence made additional misrepresentations in which he inflated the Portfolio Companies' revenues. For example:

   a. Wagner told a DHT investor (Investor A) shortly before he invested $250,000 on or around April 13, 2015, that Downing had millions of dollars available to support the Funds. Wagner further stated that the Funds were sustainable until November 2015 based on the rate at which their expenses consumed their cash reserves, otherwise known as "burn rate." In fact, as Wagner knew or recklessly disregarded, the Funds and Downing had less than $200,000 at the time.

   b. Shortly before June 25, 2015, Wagner assured a prospective DIP investor (Investor B) that DIP had approximately $1 million cash on hand, when, in fact, as Wagner knew or recklessly disregarded, DIP held less than $300,000 in its bank accounts at the time.

   c. Lawrence falsely told a DDHG investor (Investor C) shortly before he invested $250,000 in DDHG on or around June 30, 2014, that the Portfolio Companies had generated $10 million in revenue for the Funds and that, therefore, investments made by DDHG's investors constituted a small fraction of DDHG's revenues. In fact, as Lawrence knew or recklessly disregarded, investments by the investors into DDHG constituted the majority, if not all, of

       the DDHG's incoming cash flow, including the incoming transfers to DDHG's bank accounts, and DDHG had little to no other revenues.

   d. Lawrence assured two DDHG investors (Investors D and E) before they invested $250,000 on October 6, 2014 and $125,000 on December 17, 2014, respectively, that the Funds had millions of dollars in cash reserves in the bank when, in fact, as Lawrence knew or recklessly disregarded, the Funds held less than $400,000 in their bank accounts at the time.

   e. Lawrence told a Cliniflow investor (Investor F) shortly before he invested $250,000 in July 2016, that Cliniflow had raised approximately $12 million from investors. In fact, Cliniflow had raised less than $1.5 million and had a bank balance of less than $300,000 at the time.

   f. On September 6, 2016, Wagner and Lawrence told a Cliniflow investor (Investor G) shortly before he invested $250,000, that Cliniflow was well-funded. In fact, during this time period, Cliniflow had a bank balance of less than $10,000.

46. Wagner's and Lawrence's misrepresentations about the Funds' cash on hand, Lawrence's misrepresentations about the Funds' revenues from the Portfolio Companies, and Wagner's misrepresentations about the Funds' burn rate were all central to investors' decisions to invest in the Funds because they provided investors comfort that they would likely be paid their salaries, that the Funds were stable, and that they would profit from their investments.

    **2. Wagner and Lawrence Knew, or Recklessly Disregarded, That Their Statements to Investors Were False**

47. Wagner knew or recklessly disregarded that his statements about cash reserves and bank account balances were false given that he had complete access to the Funds' financial

statements and that he controlled the incoming and outgoing cash flows of all of the Downing entities by virtue of his control over their bank accounts.

48. Wagner's knowledge about the true nature of the Funds' financial condition, and the significant cash flow problems, was further reflected in email exchanges. For example, in an email exchange with a Downing employee on or around August 20, 2014 about "outstanding pay" issues, Wagner admitted that he was "antsy about not getting paid as well." Similarly, in an email of December 23, 2014, Wagner told Downing employees that the Funds needed more investor capital in order to meet shortfalls relating to operating expenses.

49. By April 2014, Lawrence also knew or recklessly disregarded the falsity of his statements about the Portfolio Companies' revenues and potential profitability.

50. On April 4, 2014, Lawrence sent a DIP employee a business profile for a particular Portfolio Company ("Company A"), stating that Company A had no revenues and that its healthcare product was "still a concept—design requires determining the availability of the required technology."

51. Later that month, Lawrence began receiving "pipeline reports" for DDHG stating that Company A was the only Portfolio Company in DDHG's portfolio. These Pipeline Reports continued to list Company A as DDHG's only Portfolio Company in June 2014, the same time that Lawrence was meeting with potential investors and told at least one of them, Investor C, that the Portfolio Companies were generating $10 million in revenue.

52. Additionally, Lawrence knew or recklessly disregarded that by early August 2014, the Funds were unable to meet basic payroll requirements, given that he communicated frequently with dissatisfied investors about missed payroll payments.

   a. On August 15, 2014, for example, Lawrence and other Downing employees

received an email from another employee stating that an investor, Investor C, was "very concerned about his payroll ... as he's now been on board for about a month and hasn't received his first bi-monthly paycheck."

    b. Another investor, Investor D, who did not receive his first or second paycheck on time emailed Lawrence in November 2014 to ask: "is there anything I should be concerned about? I finished a call with [another employee of the Funds] and he was very coy about answering my questions and directed me to you. It gave me the feeling something isn't right and he didn't want to comment."

53. Lawrence had communications with several other DDHG investors about the Funds' failure to meet payroll obligations.

    a. For example, Lawrence told an investor (Investor H), shortly after he invested $150,000 in DDHG in or around September of 2014, that there was no money for payroll.

    b. Further, in January 2015, Lawrence discussed a "2014 Payroll Recovery Plan" with Investor H, given the difficulties that the Funds had with meeting payroll obligations.

54. Lawrence invested $100,000 in the Funds in March 2014, and then received at least $220,000 from the Downing entities from approximately March 2014 through August 2016. Lawrence received the majority of this money while he was soliciting the prospective investors from June 2014 through August 2016.

**D. Wagner Used New Investor Proceeds to Satisfy Obligations with Respect to Existing Investors**

55. Starting around November 25, 2014, Wagner exchanged emails with Lawrence

and other Downing employees discussing the Funds' inability to make payroll and the prospect of using new investor funds to make overdue payments to prior investors.

56. On at least two occasions, on or around November 25, 2014, Lawrence requested that Defendants use $400,000 in incoming investor proceeds to satisfy "accrued payroll commitments and outstanding expenses." Wagner agreed to this request and the funds were used to pay salaries of earlier investors, contrary to the disclosures Defendants made to incoming investors.

57. As another example, on December 1, 2014, DDHG's bank account, which had an account overdraft of $24,000, received $150,000 from an investor (Investor I). On the same day, DDHG wired $40,000 to Downing and $16,000 to a previous investor to meet outstanding obligations and, over the next two weeks, DDHG sent over $50,000 of Investor I's proceeds to a payroll services company to meet other outstanding investor obligations.

58. As a result of Defendants' fraudulent conduct, including their misappropriation of investor proceeds and improper use of investor proceeds, investors have lost millions, and the Funds have been drained of liquidity and ceased operations.

### FIRST CLAIM FOR RELIEF
**Violations of Sections 17(a) of the Securities Act**
**(All Defendants)**

59. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58 of this Complaint.

60. During the Relevant Period, Wagner, Downing, DIP, DDHG, and Lawrence, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, have: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of

untrue statements of a material fact or omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers.

61. By reason of the foregoing, Wagner, Downing, DIP, DDHG, and Lawrence have violated, and, unless enjoined, will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(All Defendants)

62. The Commission repeats, realleges and incorporates by reference paragraphs 1 through 58 of this Complaint.

63. By virtue of the foregoing, Defendants Wagner, Downing, DIP, DDHG, and Lawrence, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

64. By virtue of the foregoing, Defendants Wagner, Downing, DIP, DDHG, and Lawrence have violated, and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

## THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act
### and Rule 206(4)-8 Thereunder
### (Wagner and Downing)

65. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58 of this Complaint.

66. During the Relevant Period, Wagner and Downing, acting as an investment adviser, directly or indirectly, singly or in concert, by use of the mails or the means or instrumentalities of interstate commerce, have employed devices, schemes or artifices to defraud clients or prospective clients; engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients or prospective clients; employed acts, practices, or course of business which are fraudulent, deceptive, or manipulative; or have made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in a pooled investment vehicle.

67. By reason of the foregoing, Defendants Wagner and Downing, directly or indirectly, singly or in concert, have violated, and, unless enjoined, will continue to violate, Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## FOURTH CLAIM FOR RELIEF
### Control Person Liability for Downing's and DIP's Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Wagner)

68. The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 58 of this Complaint.

69. At all times relevant hereto, Wagner, directly or indirectly, controlled Downing

and DIP. By engaging in the conduct alleged above, Wagner is liable as a control person, under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for Downing's and DIP's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FIFTH CLAIM FOR RELIEF
### Aiding and Abetting DDHG's Violations of Sections 17(a) of the Securities Act and of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Wagner, Downing, and DIP)

70. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58 of this Complaint.

71. As alleged above, DDHG violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

72. Wagner, Downing, and DIP each knew or recklessly disregarded that DDHG's conduct was improper and in violation of law and knowingly or recklessly provided substantial assistance to DDHG in this conduct.

73. By virtue of the foregoing, Wagner, Downing, and DIP aided and abetted and, unless enjoined, will continue aiding and abetting, violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

### SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Downing's Violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder
### (Wagner and Lawrence)

74. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 58 of this Complaint.

75. As alleged above, Downing violated Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

76. Wagner and Lawrence knew or recklessly disregarded that Downing's conduct was improper and in violation of law and knowingly or recklessly provided substantial assistance to Downing in this conduct.

77. By virtue of the foregoing, Wagner and Lawrence aided and abetted and, unless enjoined, will continue aiding and abetting, violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court grant the Commission a Final Judgment:

### I.

Permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of each of the securities laws and rules promulgated thereunder as alleged herein.

### II.

Directing each of the Defendants to disgorge all ill-gotten gains, and ordering each of them to pay prejudgment interest thereon.

### III.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act, [15 U.S.C. § 80b-9(e)].

### IV.

Granting such other and further relief as the Court may find appropriate or necessary for the benefit of investors.

Dated: June 14, 2019
      New York, New York

Respectfully submitted,

_/s/ M.P. Berger_

Marc P. Berger
Lara Shalov Mehraban
Sandeep Satwalekar
Jorge G. Tenreiro
Christopher Dunnigan

New York Regional Office
SECURITIES AND EXCHANGE
  COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-9145 (Tenreiro)
*Attorneys for the Plaintiff*